**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Marcus Labertew a/k/a Mark Labertew and Jane Doe Labertew, Husband and Wife; John McDermott a/k/a/ Jack McDermott and Jennifer McDermott, Husband and Wife,<br><br>Plaintiff,<br><br>v.<br><br>Chartis Property Casualty Company, Otherwise Known as AIG Casualty Company, and 21st Century North America Insurance Company f/k/a American International Insurance Company,<br><br>Defendant. | No. CV-13-01785-PHX-DGC<br><br>**ORDER** |

Plaintiffs Marcus Labertew and John and Jennifer McDermott seek to enforce a judgment against Defendant Chartis Property Casualty Company, otherwise known as AIG Casualty Company and 21st Century North America Insurance Company, formerly known as American International Insurance Company. Doc. 42. Plaintiffs have filed a partial motion for summary judgment (Doc. 96) and Defendant has filed a motion for summary judgment (Doc. 94). The motions are fully briefed (Docs. 100, 102, 108, 109), and although Defendant requests oral argument, the Court concludes that such argument will not aid its decision. *See* Fed. R. Civ. P. 78(b); LRCiv 7.2(f). For reasons stated below, the Court will deny Plaintiffs' motion and grant Defendant's motion.

# I.  Background.

The following facts are undisputed unless otherwise noted.

Plaintiffs Marcus Labertew and John McDermott were former employees and officers of BioNovix, Inc., a business engaged in the distribution and sale of health products.  Doc. 95-3 at 3 ¶¶ 2, 6.  Loral Langemeier was a BioNovix investor and director. *Id*. ¶ 2.  Ms. Langemeier held a homeowner's insurance policy and an excess insurance policy issued by Defendant for the period from June 26, 2009 to June 26, 2010, both of which included personal liability coverage.  Doc. 95 ¶ 1.

Plaintiffs sued Ms. Langemeier and Fred Auzenne in state court, asserting breach of contract, defamation, fraud, and other claims arising out of their employment with BioNovix.  Doc. 95-3; *see Labertew v. Auzenne*, No. CV2010-051209 (Ariz. Super. Ct. Mar. 11, 2010).  This lawsuit will be referred to in this order as the "underlying lawsuit." Plaintiffs alleged that Ms. Langemeier and Mr. Auzenne committed the wrongful acts in their personal capacity and not on behalf of BioNovix.  *Id*. at 3 ¶ 3.  After more than two years of litigation, Ms. Langemeier tendered the defense of the underlying lawsuit to Defendant.  Her tender letter cited Arizona case law and included a copy of Plaintiffs' first amended complaint, eight pages of deposition from Mr. McDermott, and seven pages of an oral argument transcript.  Doc. 95 ¶ 6.  In a letter dated February 4, 2013, Defendant informed Ms. Langemeier that the claims in the underlying lawsuit were excluded by the director's errors or omission exclusion and the business pursuits exclusion of her insurance policies.  Doc. 48 at 11-15.  The letter stated that if Ms. Langemeier disagreed, she should provide additional materials including transcripts of all depositions, pleadings, summary judgment motions, pleadings for other related cases, and any other documents that may be helpful.  *Id*.

The underlying lawsuit went to trial in state court, and, on the third day of trial, Plaintiffs and Ms. Langemeier entered into a stipulated judgment against Ms. Langemeier for $1.5 million.  Doc. 1-16 at 27-28.  The judgment was part of what is commonly called a "*Damron* agreement" under Arizona law.  It included a covenant not to execute on the

judgment against Ms. Langemeier and an assignment to Plaintiffs of Ms. Langemeier's insurance coverage and bad faith claims against Defendant. *See* Doc. 103-1; *see also Damron v. Sledge*, 460 P.2d 997 (Ariz. 1969).

Rather than filing a new action against Defendant asserting the claims assigned by Ms. Langemeier, Plaintiffs chose to attempt to collect the stipulated judgment through a garnishment action against Defendant. Doc. 1-16 at 41-45. Plaintiffs initiated the garnishment action in state court, and Defendant removed it to this Court and answered the writs of garnishment, denying that it owed any funds to Plaintiffs. Docs. 6, 7. Plaintiffs did not file timely objections to the answers, and Defendant requested that the Court enter judgment in its favor. Doc. 9. The Court did so, finding that under Federal Rule of Civil Procedure 69(a), Arizona procedures governed the removed garnishment proceeding and Plaintiffs had failed to comply with Arizona's ten-day objection requirement. Docs. 26; 27. On appeal, the Ninth Circuit reversed, holding that Rule 69 did not apply to this case because there was no federal judgment. Doc. 38. The court of appeals remanded the case with instructions to allow re-pleading. Doc. 38.

After remand, Plaintiffs filed an amended complaint asserting the insurance coverage and bad faith claims assigned to them by Ms. Langemeier and seeking to recover the $1.5 million stipulated judgment, as well as damages for insurance bad faith. Doc. 42 at 3-4. Plaintiffs now move for summary judgment on the choice of law in this case, arguing that California law should apply. Doc. 96. Defendant moves for summary judgment on Plaintiffs' claims. Doc. 94.

## II. Legal Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

**III.     Discussion.**

    **A.     Plaintiff's Motion for Partial Summary Judgment.**

        **1.     Choice of Law for Contracts.**

In diversity cases, "the district court must apply the choice-of-law rules of the state in which it sits." *Abogados v. AT & T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000). Arizona follows the Restatement's "most significant relationship" test. *See Bates v. Super. Ct.*, 749 P.2d 1367, 1369 (Ariz. 1988); *Magellan Real Estate Inv. Tr. v. Losch*, 109 F. Supp. 2d 1144, 1155 (D. Ariz. 2000). The Restatement contains general principles to be applied to all conflicts, general principles to apply to contracts, and specific principles to apply to insurance contracts. Restatement (Second) of Conflict of Laws §§ 6, 188, 193.

Section 193 provides that the rights created by a contract of fire, surety, or casualty insurance "are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy." That is "unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied." Restatement (Second) of Conflicts § 193; *see also Beckler v. State Farm Mut. Auto Ins.*, 987 P.2d 768, 772 (Ariz. Ct. App. 1999). Courts should consider the choice-of-law principles in § 6 when considering if another state has a

more significant relationship to the insurance contract and the parties. The Court may also look to § 188 to inform the § 6 analysis. *Id*. cmt. c.

Plaintiffs argue that California law applies because one of Ms. Langemeier's insured risks is located there, and it has the most significant relationship to the transaction and the parties. Doc. 96 at 3-4. Defendant asserts that Arizona law applies because it governs the underlying *Damron* agreement, the insured risk is located in Arizona, and Arizona has the most significant relationship to the parties. Doc. 100 at 7-12.

### a. The Insured Risk.

The insured risk is the object or activity that is the subject matter of the insurance policy, and its principal location is in the "state where it will be during at least the major portion of the insurance period." Restatement (Second) of Conflicts § 193 cmt. b. Under § 193, the location of the insured risk should be given the greatest weight when determining which state's law applies, so long as the risk can be located, at least principally, in a single state. *Id*. But the importance of the location of the insured risk varies from case to case. *Id*. Plaintiffs argue that the insured risks in this case are located in Nevada and California because those are the locations of the properties covered by Ms. Langemeier's homeowner's and excess liability insurance policies. Doc. 96 at 3.

Courts are split on whether an "insured risk" under a homeowner's policy would continue to be the home when the suit is filed under the policy's personal liability coverage. *Compare Metropolitan Prop & Cas. Ins. v. Gilson*, No CV-09-01874-PHX-GMS, 2010 WL 2721906, at *2 (D. Ariz. July 7, 2010) (location of the home is the location of the insured risk)*, with AIG Prop. Casualty Ins. v. Green*, 217 F. Supp. 3d 415, 425 n.11 (D. Mass. Nov. 8, 2016) (noting that the insured's personal liability is the insured risk, so the proper location should be the insured's domicile).

In *Beckler v. State Farm Mut. Auto. Ins.*, 987 P.2d 768 (Ariz. Ct. App. 1999), the plaintiffs sought payment from an underinsured motorist policy when their son was injured as a pedestrian by a hit-and-run driver. *Id*. Plaintiffs resided in Nebraska, but their son and their insured car were in Arizona. *Id*. In its choice-of-law analysis, the Arizona Court

of Appeals determined that the location of plaintiffs' Arizona vehicle was dispositive because the automobile was the policy's insured risk. *Id.* Even though underinsured motorist policies will cover the insured individual around the world, the policy coverage would not exist but for the plaintiffs' car. *Id.* n.4.

Ms. Langemeier's personal liability coverage applies to actions she personally takes that give rise to liability, not conditions in her homes, and therefore logically could attach to her, not her homes. But the liability insurance would not exist without her homes, and, under *Beckler*, the homes therefore are the "insured risks" for purposes of construing her insurance contracts. Ms. Langemeier's homeowners' insurance policy covers three homes in Nevada. See Doc. 103-3 at 3-40. And her excess liability policy covers three homes in Nevada and one in California. Doc. 103-3 at 80. The locations of the insured risks are therefore Nevada for the homeowner's policy and California and Nevada for the excess liability policy. *See* Doc. 97 ¶ 9.

Defendant argues that the insured risk is the defense of the suit in Arizona (Doc. 100), but this argument is not consistent with the definition of "insured risk." The insured risk was the liability arising from Ms. Langemeier's actions, not the lawsuit itself. Defendant also argues that the place of insured risk is less important because this is a multiple risk policy, considered under comment f to § 193. Doc. 100 at 7-8. A multiple risk insurance policy is one in which a single policy insures risks in several states. Restatement (Second) of Conflicts § 193 cmt. f. A multiple risk policy usually incorporates any special local laws of the location of the insured risk. *Id.* While Ms. Langemeier's excess liability policy does appear to be a multiple risk policy, Defendant does not explain why that fact would affect the Court's analysis because none of the insured risks were located in Arizona.

### b. Section 6 and 188 Factors.

After determining the location of the insured risk, the Court must consider whether another state has a more significant relationship to the contract and the parties. *See* Restatement (Second) of Conflicts § 193. To determine if there is another state with a more

significant relationship, the Court must examine the principles in § 6, as well as the factors in § 188. *Id.* The significant relationship test is qualitative not quantitative. *See Bates*, 749 P.2d at 1370.

Section 6 identifies several underlying principles to aid in evaluating all conflicts: (1) the needs of the interstate and international systems; (2) the relevant policies of the forum; (3) the relevant policies of other interested states and the relative interests of those states in determination of the particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability, and uniformity of result; and (7) ease in the determination and application of the law to be applied. Restatement (Second) of Conflict of Laws § 6.

Section 188 provides additional contract-specific factors, including the (1) place of contracting; (2) place of negotiation of the contract; (3) place of performance; (4) location of the subject matter of the contract; and (5) domicile, residence, nationality, place of incorporation, and place of business of the parties. Restatement (Second) of Conflict of Laws § 188(2).

Considering the relevant factors, Arizona is the state with the most significant relationship. The parties are all residents of Maricopa County, Arizona, and BioNovix's principal place of business is Arizona. *See* 95-3 ¶ 2. The relevant underlying events, including all BioNovix business interactions, phone calls, and employment contracts occurred in Arizona. *See id.* ¶¶ 6-26. The only event that did not occur in Arizona was the arrest Plaintiffs alleged to support their false imprisonment claim. *Id.* ¶¶ 38-42. The arrest occurred in South Korea when Mr. McDermott was traveling on BioNovix business, and Ms. Langemeier called the Korean distributor from Arizona to report Mr. McDermott for withholding funds from their Korean distributor. *See id.* When Ms. Langemeier tendered her defense, she cited Arizona law, and Defendant sought Arizona coverage analysis to determine if Ms. Langemeier's claims were covered. *See* Doc. 103-2 at 1-3, 13-14. Further, the underlying lawsuit was filed in Arizona and under Arizona law, and no party

discussed California law before this motion. The weight of the evidence shows that the parties expected Arizona law to apply. Plaintiffs cite no evidence to the contrary.[1]

Plaintiffs argue that California law should govern because it is the location where performance and breach of the insurance contract occurred. Doc. 96 at 4. The claims handling was in California and the denial of defense and indemnification occurred in California and was later approved in New Jersey. *Id.* But as noted above, Defendant applied Arizona law in analyzing its duty to defend, and the alleged breach of contract is the failure to defend, which occurred in Arizona. *See cf. Landi v. Arkules*, 835 P.2d 458, 462-63 (Ariz. Ct. App. 1992) (finding Arizona law applied where the only connection to Illinois was the location of the private investigator's office, but the investigation and all of the parties were in Arizona). Under Plaintiffs' reading, every insured would be subject to the law of the state where their claims were processed, giving insurers the choice of law based on where they send the claim. *See cf. Bates*, 749 P.2d at 1372 (as a national coverage provider the insured could not reasonably expect that every aspect of its conduct would be governed by the law of the state in which the contract originated). This is not a logical application of § 6 or § 188.

Plaintiffs also note that California law has a public policy prohibiting insurance carriers from refusing a defense without having all the facts before it. Doc. 109 at 9 (citing *Mullen v. Glens Falls Ins.*, 73 Cal. App. 3d 163, 173-74 (Ct. App. 1977). Plaintiffs misrepresent the holding of *Mullen*, which states that the duty to defend arises whenever the insurer "ascertains facts which give rise to the potential of liability under the policy." 73 Cal. App. at 169. In these circumstances under California law, the crucial question is whether the insurer is in possession of factual information giving rise to potential liability. *Id.* at 170. If an insurer has such information, then the insurer cannot refuse to defend the lawsuit without further investigation. *Id.* at 173 ("[A]n insurance company, without making an investigation of any kind, [cannot] deny an insured a defense at a time when it

---

[1] Plaintiffs state that Ms. Langemeier expected Nevada or California law to apply to the policy but fail to cite supporting evidence in the record. Doc. 96 at 5.

has reason to believe that there is potential liability under the insurance policy."). This is substantially similar to Arizona law, which requires an insurer to investigate if "the insured makes some factual showing that the suit is actually one for damages resulting from events that fall under policy terms." *Lennar Corp. v. Auto-Owners Ins.*, 151 P.3d 538, 547 (Ariz. Ct. App. 2007). No strong policy difference warrants applying California law.

The Court finds Arizona is the state with the most significant relationship and that Arizona law governs the breach of contract claims.

## 2. Choice of Law for Torts.

Arizona courts apply the principles of the Restatement (Second) of Conflicts when determining the controlling law of multistate torts. *Bates*, 749 P.2d at 1369. "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restatement (Second) of Conflicts § 145(1). The Court should consider "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicil, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflicts § 145(2). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Magellan*, 109 F. Supp. 2d at 1156.

### a. The Place of Injury.

"The place of injury is where the last event necessary for liability occurred (that is, the place where the injury manifested)." *Pounders v. Enserch E&C, Inc.*, 306 P.3d 9, 13 (Ariz. 2013). For bad faith claims, the last event necessary for a compensable injury is the unreasonable acts of the insurer.[2] *See Miel v. State Farm Mut. Auto. Ins.*, 912 P.2d 1333, 1339 (Ariz. Ct. App. 1995). Here, the allegedly unreasonable acts of Defendant happened

---

[2] Arizona courts have found the place of injury to be Arizona because that is where the insured's personal injury or distress from the bad faith manifested. *See, e.g.*, *Bates*, 749 P.2d at 1370. In those cases, the insured alleged a personal injury resulting from the bad faith, but no such injury has been alleged here.

in California when it denied the claim.  The first factor weighs in favor of applying California law.

### b.    Conduct Causing the Injury.

Defendant allegedly injured Ms. Langemeier through its bad faith actions.  The only Arizona event that relates to Ms. Langemeier's claim is her receipt of the denial letter.  The more significant event – the bad faith conduct that allegedly caused the injury – occurred in California.  *See* Doc. 96 at 6; *see also Bates*, 749 P.2d at 1371 (finding the bad faith conduct of the insurer occurred where the decision impacting the plaintiff occurred).  This factor favors applying California law.

### c.    Domicile, Residence, or Place of Business.

Arizona applies "greater weight to the residence of the alleged tort victim" in cases where the injury is to the plaintiff's personal interests.  *See Bates*, 749 P.2d at 1371.  Plaintiffs and Ms. Langemeier are residents of Arizona.  Defendant is a Delaware corporation with its principal place of business in New York.  Doc. 97 ¶ 2.  This factor weighs in favor of applying Arizona law.[3]

### d.    The Place Where the Relationship is Centered.

Because insureds possess greater mobility than insurers, courts generally assume the relationship is centered at the insurer's headquarters.  *Bates*, 749 P.2d at 1371.  This factor favors New York law.  *See* Doc. 97-2 at 3.

### e.    Section 6 Factors.

The Restatement instructs the Court to consider § 6 factors in conjunction with § 145 factors.  *See* Restatement (Second) of Conflicts § 145.

The most important § 6 factor is the justifiable expectation of the parties.  *Bates*, 749 P.2d at 1371.  Ms. Langemeier submitted her claim citing Arizona law and seeking defense of an Arizona lawsuit, and she sought analysis of the claims under Arizona law.

---

[3] Plaintiffs argue that Ms. Langemeier was domiciled in Nevada because her policy indicates a Nevada post office box mailing address.  *See* Docs. 96 at 7; 97 ¶ 6.  But Plaintiffs' complaint alleged that Ms. Langemeier resided in Maricopa County.  Doc. 95-3 ¶ 2.  A post office box cannot alone show that she was domiciled in Nevada.

Nor would she have expected California law to apply when she sent the claim to Defendant's Georgia office, not knowing it would be rerouted to California. Docs. 96 at 8; 97 ¶ 11. Plaintiffs have provided no evidence that any of the parties expected California law to apply when every other aspect of the lawsuit was centered in Arizona.

The needs of the interstate system – one of the § 6 factors – considers the choice-of-law rules adopted by the various states, emphasizing that uniformity in choice-of-law principles will serve the purposes of an interstate system of commerce. Restatement § 6, cmt. d; *Gomez-Silva v. Jackson Nat. Life Ins. Co.*, No. CV09-2120 PHX DGC, 2011 WL 1656507, at *4 (D. Ariz. May 3, 2011). Arizona follows the Restatement and thereby furthers the interests of uniformity in choice-of-law principles. This factor therefore does not suggest that California has a more significant relationship to the parties or transaction.

Section 6 also identifies two other relevant factors: the relative interests of the states in determination of the particular issue, and ease in the determination and application of the law to be applied. Restatement (Second) of Conflict of Laws § 6. The Court cannot conclude that California has a significant interest in determining whether the Arizona-based Plaintiffs, acting on claims assigned by an Arizona-based insured, are entitled to coverage and bad faith damages against a Delaware corporation with its principal place of business in New York. Arizona, on the other hand, has an interest in whether its citizens are entitled to such coverage and damages. And the ease of determining and applying the relevant law is greater for this Arizona-based Court if the law is Arizona's. These factors favor application of Arizona law.

### f. Summary.

Among the § 145 factors, two favor California law, one favors Arizona law, and one favors New York law. Three of the § 6 factors favor Arizona law. Because the § 6 factors and the place of residence favor Arizona, and Plaintiffs have not shown why California has any significant interest in the issues in this case, the Court finds that Arizona is the state with the most significant relationship to the alleged torts in this case.

### 3. Conclusion.

The Court will deny Plaintiffs' motion for summary judgment on choice of law, will apply Arizona law, and declines to address Defendant's remaining arguments.

### B. Defendant's Motion for Summary Judgment.

Defendant moves for summary judgment on the issue of coverage of Plaintiffs' claims under Ms. Langemeier's policies and on Plaintiffs' bad faith claims. Doc. 94 at 1-2.

### 1. Coverage.

Defendant argues that the following exclusions preclude coverage of Plaintiffs' claims: the business enterprise exclusion, the directors' errors or omissions exclusion, the intentional acts exclusion, and the contractual exclusion. Doc. 94 at 8-13.

### a. Business Pursuits Exclusion.

Business activities are usually excluded from personal liability policies because they represent "additional risks over and beyond the ordinary and usual hazards to be found in the operation and maintenance of a home." *Kepner v. W. Fire Ins.*, 509 P.2d 222, 223 (Ariz. 1973). Ms. Langemeier's homeowners and excess policies expressly exclude:

> Personal injury or property damage arising out of an insured person's business property or business pursuits, investment activity or any activity intended to realize a profit for either an insured person or others.

Doc. 103-3 at 53, 93. The policy defines "business" as a "part-time or full-time trade, occupation, or profession." Doc. 103-3 at 43.

Defendant argues that Plaintiffs' claims arose from Ms. Langemeier's business pursuits because: (1) Plaintiffs' complaint in the underlying case alleged that Ms. Langemeier was an officer and director of BioNovix, which sold health products internationally (Docs. 95 ¶ 9; 95-3 ¶¶ 2, 6); (2) the tortious conduct and defamatory statements alleged in the complaint all involved BioNovix business matters (Docs. 95 ¶¶ 15-18; 95-3 at 3-9); (3) after other board members resigned, Ms. Langemeier stated "I am the board" (Docs. 95 ¶ 16; 95-3 ¶ 15); (4) Plaintiffs' false arrest and false imprisonment claims were predicated on the allegations that Mr. McDermott was sent to

South Korea by BioNovix to address structural and business compliance issues with BioNovix's affiliated Korean entity; (5) Plaintiffs' tortious interference claim was predicated on the termination of Plaintiffs' employment contracts with BioNovix; and (6) Mr. McDermott's stroke was caused by Ms. Langemeier accusing Mr. McDermott of fraud and theft when he was employed by BioNovix (Docs. 95 ¶ 26; 95-11 at 7).

Plaintiffs argue generally that the allegations in the underlying complaint do not represent the "true facts" in support of this litigation. Doc. 104 ¶ 9. But statements made in pleading are considered judicial admissions and are "conclusively binding on the party who made them." *Christian Legal Soc. v. Martinez*, 561 U.S. 661, 716 (2010) (citing *Am. Title Ins. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988)). Thus, absent evidence to the contrary, the Court will accept as true the facts Plaintiffs alleged in their complaint in the underlying lawsuit.

### i.    The Undisputed Complaint Facts.

All of Ms. Langemeier's actions at issue in the underlying lawsuit were related to the BioNovix business. Plaintiffs do not contend that Ms. Langemeier and Plaintiffs had any relationship whatsoever outside of the business.

Plaintiffs concede that Ms. Langemeier made the allegedly defamatory statements at issue in the underlying lawsuit during conference calls with BioNovix customers, distributors, shareholders, and vendors, and that the statements accused Plaintiffs of converting BioNovix assets, taking BioNovix distributors' property, and acting in a disloyal and unprofessional manner towards BioNovix. For example, during an April 2, 2009 conference call with distributors and investors, Ms. Langemeier accused Plaintiffs of stealing company property, running the company into the ground, taking company files, taking the company server, and selling the distributor list to other companies. Doc. 95-3 ¶ 13. According to the complaint in the underlying lawsuit, Ms. Langemeier "controlled the [April 2] call." *Id*.

During a June 2009 investor call, Ms. Langemeier again stated that Plaintiffs stole and sold distributor lists. *Id*. ¶ 14. Plaintiffs' complaint alleged that BioNovix itself made

press releases defaming them, and, because Ms. Langemeier was the only board member of BioNovix at the time, she likely issued the press releases. *Id*. ¶ 15. In another example from early 2009, the complaint alleges that a former BioNovix CFO entered the company office and told Plaintiffs they had been fired and were going to jail for embezzlement. *Id*. ¶ 17. When Plaintiffs resisted, the former CFO called Ms. Langemeier, who said that Plaintiffs were terminated, she was the chairman of the board, and the other employees must turn the keys and operations over to the former CFO or they would be terminated as well. *Id*. Nor do Plaintiffs dispute that their false arrest claim arose from a BioNovix business trip to South Korea. According to the complaint, Ms. Langemeier told BioNovix's Korean distributor that Mr. McDermott was withholding funds. Docs. 95 ¶¶ 19, 40-42; XX ¶ 19. In short, all of the allegedly wrongful actions asserted in the underlying lawsuit directly related to the operations of BioNovix and Ms. Langemeier's involvement in those operations.

And Plaintiffs do not dispute that Ms. Langemeier had a substantial ownership interest in BioNovix. That ownership interest clearly would bring BioNovix and her actions related to the company within the "investment activity or any activity intended to realize a profit" language of the insurance policies' exclusion. Doc. 103-3 at 53, 93.

### ii. Plaintiffs' Arguments.

Plaintiffs argue that the business pursuits exclusion does not apply because Ms. Langemeier was a passive investor and was not conducting "regular" business or serving in an operations role. Docs. 102 at 12. According to Plaintiffs, the plain language of Ms. Langemeier's insurance policies limits the business pursuits exclusion to an insured's "trade, occupation, or profession." Doc. 102 at 9; *see also Teufel v. Am. Family Mt. Ins.*, 419 P.3d 546, 548 (Ariz. 2018) (insurance policies should be interpreted according to their "plain and ordinary meaning, examining the policy from the viewpoint of an individual untrained in the law or business"). According to Plaintiffs, the business pursuits exclusion does not apply because Ms. Langemeier was never employed by BioNovix, spent 99.9%

of her time working as a promotional speaker, and only passively invested in BioNovix. Doc.102 at 12. The Court disagrees for two reasons.

First, this argument does not address the "investment activity or any activity intended to realize a profit" language of the insurance policies' exclusion. Doc. 103-3 at 53, 93. This language, which Plaintiffs do not contend is ambiguous, clearly covers more than regular business activities at a trade, occupation, or profession. And it clearly covers Ms. Langemeier's substantial investment in BioNovix, regardless of whether she was ever employed by the company or authorized to act on its behalf.[4]

Second, the undisputed facts simply do not support Plaintiffs' assertion that Ms. Langemeier was nothing more than a passive investor in BioNovix. As noted above, the underlying lawsuit arose out of her *actions* with respect to the company – making defamatory statements during conference calls with BioNovix customers, distributors, shareholders, and vendors regarding Plaintiffs' disloyalty, dishonesty, and lack of professionalism with respect to BioNovix; causing BioNovix to issue press releases with similar statements; terminating Plaintiffs' employment with the company and threatening other company employees if they did not comply with her demands; and making statements to a BioNovix Korean distributor that resulted in Plaintiff McDermott's arrest while on a business trip for BioNovix. These undisputed actions are not the stuff of passive investors.[5]

---

[4] Plaintiffs argue that Defendant did not mention investment and profit-realizing activities when arguing the business pursuits exclusion in its motion for summary judgment, and the Court therefore cannot consider those parts of the exclusion. *See* Doc. 102 at 10. The Court does not agree. The argument section of Defendant's motion focuses primarily on Arizona case law (Doc. 94 at 8-10), but the factual predicate for the argument clearly includes the investment and profit-realizing language of the exclusion. That language is specifically quoted at the outset of the motion's business exclusion argument. *See* Doc. 94 at 8. And the motion asserts that Langemeier was one of the largest investors in BioNovix, a fact not disputed by Plaintiffs. *Id.* at 4; Doc. 95, ¶ 10; Doc. 103.

[5] Other facts support this conclusion. Ms. Langemeier testified that she "stepped in" when BioNovix was "falling apart." *See* Docs 103 ¶¶ 6,7,9; 103 1 at 29:9-11, 38:10-12. She unofficially stepped down from the board in 2008 (Docs. 103 ¶ 13;103-1 at 67), but she thereafter led conference calls, discussed BioNovix business with investors and distributors, and terminated employees (Docs. 95-3 ¶¶13-20; 103 ¶ 15). Plaintiffs alleged in the underlying lawsuit that Ms. Langemeier also participated in interviews and tried to

True, Arizona cases have stated that a business pursuit is a "continued or regular activity for the purpose of earning a livelihood such as a trade, profession, or occupation, or a commercial activity." *Goettl*, 674 P.2d at 872. The activity must be continuous and motivated by profit. *Id*. But Arizona courts also hold that temporary work can be "continuous" for purposes of a business pursuit exclusion. *See Farmers Ins. Co. of Ariz. v. Wiechnick*, 801 P.2d 501, 503 (Ariz. Ct. App. 1990) (babysitting was a business pursuit even though the insured planned on doing it temporarily). And Plaintiffs do not dispute Ms. Langemeier's profit motive.

Additionally, the insurance policies in this case define "business" as a "*part-time* or full-time trade, occupation, or profession." Doc. 103-3 at 43 (emphasis added). The policies thereby make clear that the exclusion is not limited to the insured's primary, full-time job. This comports with Arizona law. *See Goettl*, 674 P.2d at 873 (finding too narrow "[a]ppellants' interpretation . . . that only the principal activity of an insured – his business, trade, profession, or occupation – is excluded under the policy."). Thus, even if Ms. Langemeier's full-time job was motivational speaking as Plaintiffs suggest, her many part-time actions related to BioNovix in the first half of 2009 qualify as a business pursuit.

Plaintiffs argue that even though Arizona cases discuss an expansive "business pursuits" definition, all of the cases that have applied the exclusion involved individuals engaged in their principal professions or some type of continuous employment. Doc. 102 at 12. But the language in these cases is clear that the exclusion applies to activities that are continuous and profit-seeking, regardless of employment relationship or primacy. Indeed, Plaintiffs highlight language that would apply the exclusion to activities for "procuring subsistence or profit, commercial transactions or engagements," or "customary engagements" that are *not* "stated occupations." *See* Doc. 102 at 11-12 (citing *Goettl*, 674 P.2d at 873).

Plaintiffs cite several cases where insured investments were not excluded by the business pursuits exclusion. In these cases, the insured had only minimal involvement in

---

bring in more investor money. Doc. 95-3 ¶ 8.

the investment, the business interest was undeveloped, or the courts narrowly interpreted the exclusion to apply only to activities associated with the insured's primary trade or profession. *See* Doc. 102 at 12-13 n.1; *see, e.g., Eyler v. Nationwide Mut. Fire Ins.*, 824 S.W.2d 855, 859 (Ky. 1992) (finding insured's involvement was limited to investing money and protecting the investment); *Brickell v. U.S. Fire Ins.*, 436 So.2d 797, 800 (Miss. 1983) (narrowing business pursuits to just the insured's principal occupation); *Erie Ins. Exchange v. Szamatowicz*, 597 S.E.2d 136, 139-40 (N.C. Ct. App. 2004) (finding no business pursuit where the insured purchased a warehouse but had no definite business use in mind). These cases are inapposite. Ms. Langemeier clearly had more than a minimal involvement in a developed business, and Arizona is not in the minority of states that limit business pursuits to the insured's principal occupation. *See Goettl*, 674 P.2d at 872.

### iii.    Arising Out of Business Pursuits.

The claims in Plaintiffs' suit arose from Ms. Langemeier's activities, regardless of whether they are characterized as business pursuits, investment, or profit-realizing activities, all of which expressly fall within the exclusion. Under Arizona law, a claim "arises from business pursuits" if it originates from or shares a causal connection with the insured's business activities. *See Fimbres*, 708 P.2d at 757-58. Here, the statements that formed the basis of Plaintiffs' defamation and false imprisonment claims were made while Ms. Langemeier was communicating with BioNovix investors, customers, and business affiliates. And her termination of Plaintiffs' employment at BioNovix was directly connected to the business.

Plaintiffs argue that an issue of fact exists as to whether Ms. Langemeier's actions were properly taken on behalf of BioNovix because at the time there was no legally constituted board. Doc. 102 at 3. But whether Ms. Langemeier was acting lawfully on behalf of BioNovix and therefore was entitled to personal immunity from liability – the issue on which the superior court found a question of fact in the underlying lawsuit – is a different question from whether her actions originated in or shared a causal connection with her BioNovix-related business activities – the issue in this case. *See Fimbres*, 708

P.2d at 757-58. The business pursuits exclusion encompasses more than actions made with legal authorization of the business and therefore entitled to personal immunity. Indeed, if it was limited to the latter, there would be no need for the exclusion because the insured would not be liable. As discussed above, actions sufficient to fall within the business pursuits exclusion need only be connected to or flow from the business activities.

Plaintiffs also argue that the exclusion violates the insured's reasonable expectation of coverage. Doc. 102 at 9. The test for reasonable expectation "focuses on whether the insurance carrier has reason to believe that the insured would not have assented to the terms of the policy as a whole if the insured had known that it contained the clause being contested." *Do by Minker v. Famers Ins. of Ariz.*, 828 P.2d 1254, 1257 (Ariz. Ct. App. 1991) (citing *Darner Motor Sales, Inc. v. Univ. Underwriters Ins.*, 682 P.2d 388, 396-97 (Ariz. 1984)). Plaintiffs argue that Ms. Langemeier had a reasonable expectation that Defendant would defend and indemnify her because the policy states that it will "pay the costs to defend an insured person against any suit seeking covered damages for personal injury or property damages, even if the suit is false, fraudulent, or groundless." Doc. 102 at 10. But this language reasonably could have created an expectation of coverage only for lawsuits "seeking covered damages." *Id.* Injuries resulting from business pursuits were not included in "covered damages." And Plaintiffs cite no evidence that Ms. Langemeier would not have purchased the policy had she understood the extent of the business exclusion, much less that Defendant knew this fact. As the Arizona Court of Appeals has explained: "Applicability of the [reasonable expectations] doctrine requires more than the fervent hope that is usually engendered by loss, and the expectations to be realized must be those that have been induced by the making of a promise." *State Farm Fire & Cas. Co. v. Powers By & Through Fleming*, 786 P.2d 1064, 1067 (Ariz. Ct. App. 1989). Plaintiffs present no evidence of a promise by Defendant that would have induced Ms. Langemeier to believe that her actions at BioNovix would be covered by her homeowner's policies.

Nor do Plaintiffs present evidence that Ms. Langemeier was unaware of the business pursuits exclusion. *Averett v. Famers Ins. of Ariz.*, 869 P.2d 505, 507 (Ariz. 1994). Her

policies, by their terms, did not cover damages arising out of business pursuits and investment and profit-realizing activity, and any expectation to the contrary cannot be viewed as objectively reasonable on this record. *See Miller v. State Farm Fire & Cas. Co.*, 804 P.2d 822, 826 (Ariz. Ct. App. 1990) ("[E]xpectation of coverage must be objectively reasonable."). The Court finds no genuine issue of fact that Ms. Langemeier had a reasonable expectation of coverage for her actions at BioNovix.

### b.    Conclusion.

The Court finds that Plaintiffs' claims in the underlying lawsuit clearly fall within the insurance policies' business pursuits exclusion, and will grant summary judgment to Defendant on the issue of coverage. The Court need not consider whether Plaintiffs' claims also are excluded by the directors' acts and omissions or the intentional act exclusions.

### 2.    Bad Faith Claim.

An insurance contract is not an ordinary commercial bargain; "implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured." *Zilisch v. State Farm Mut. Auto. Ins.*, 995 P.2d 276, 279 (Ariz. 2000) (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 570 (1986)). The tort of bad faith arises when the insurer "intentionally denies [or] fails to process or pay a claim without a reasonable basis." *Id.* If an insurer acts unreasonably in the manner it processes a claim, it will be held liable for bad faith "without regard to [the claim's] ultimate merits." *Id.*

### a.    Wrongful Denial of Coverage.

Plaintiffs' bad faith claim is based on Defendant's allegedly unreasonable denial of coverage and Ms. Langemeier's request to defend. *See* Doc.102 at 18. Because the Court finds no coverage under the policies' business pursuits exclusion, there can be no bad faith based on wrongful denial of coverage. *See Manterola v. Farmers Ins. Exchange*, 30 P.3d 639, 646 (Ariz. Ct. App. 2001) ("[A] bad faith claim based solely on a carrier's denial of coverage will fail on the merits if a final determination of noncoverage ultimately is made.").

b.    **Reasonableness of Defendant's Claim Handling.**

To prove bad faith, a party must show: (1) the insurer unreasonably investigated, evaluated, or processed its claim (an objective test); and (2) the insurer either knew it was acting unreasonably or "act[ed] with such reckless disregard that such knowledge may be imputed to it (a subjective test)." *Nardelli v. Metro. Grp. Prop. & Cas Ins.*, 277 P.3d 789, 794-95 (Ariz. Ct. App. 2012). An insurer may challenge a claim it believes is "fairly debatable," but only if the insurer acts reasonably in investigating, evaluating, and processing the claim. *Zilisch v. State Farm Mut. Auto. Ins.*, 995 P.2d 276, 280 (Ariz. 2000).

Plaintiffs argue that Defendant performed no investigation before denying Ms. Langemeier's claim. Doc. 102 at 18. Defendant did not interview Ms. Langemeier or any other participants in the underlying litigation. *Id*. The evaluation consisted of reviewing the documents provided in her tender of the defense. *Id*. Plaintiffs argue that Defendant failed to follow its own claims handling manual, which required fact acquisition and written or recorded witness statements. *Id*.; Doc. 103-3 at 409:12-25. Plaintiffs' expert testified that an insurance carrier has an immediate duty to investigate, including talking to the insured immediately. Doc. 102 at 19.

Defendant responds that it had no duty under Arizona law to investigate outside of the allegations of the underlying compliant where those allegations fail to plead a covered claim. Doc. 94 at 15 (citing *U.S. Fidelity & Guar. Corp. v. Advance Roofing & Supply Co.*, 788 P.2d 1227, 1231 (Ariz. Ct. App. 1989)); *see also Kepner*, 509 P.2d at 224. Under *Kepner*, when the allegations of a complaint suggest that a claim is covered, an insurer nonetheless may investigate the claim and determine, on the basis of facts outside the complaint, that there is no coverage. 509 P.2d at 224. But when the claims stated in the complaint would not be covered, *Kepner* does not require the insurer to make such an investigation. *See Advance Roofing*, 788 P.2d at 1231. Stated differently, if the complaint containing the allegedly covered claim shows on its face that the claims are not covered, an insurer is not required to conduct an investigation to determine whether the complaint is wrong. The insurer's duty to investigate is triggered only when "the insured makes some

factual showing that the suit is actually one for damages resulting from events that fall under policy terms." *Lennar Corp. v. Auto-Owners Ins.*, 151 P.3d 538, 547 (Ariz. Ct. App. 2007).

Plaintiffs cite two cases to support their argument that Defendant had an obligation to investigate the claim – and committed bad faith by failing to do so – even if Plaintiffs' complaint did not plead a covered claim. *See* Doc. 102 at 18. In *Zilisch*, the Arizona Supreme Court stated that "[t]he carrier has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim." 995 P.2d at 280. The Court discussed the insurer's obligation in relation to bad faith claims, but did not address its holding in *Kepner*. In 2018, the Supreme Court issued *Teufel v. American Family Mutual Ins.*, 419 P.3d 546 (Ariz. 2018), which cited *Kepner* and stated that an insurer's duty to defend "generally arises if the complaint filed against the insured alleges facts that fall within the policy's coverage." *Id.* at 548. This statement is important for two reasons – the insurer's duty arises when the complaint pleads a claim that is covered, and *Kepner* remains good law. The Supreme Court went on to say even when a covered claim is pleaded, "[t]he insurer may investigate the matter . . . and refuse to defend based on facts discovered outside the complaint that take the case outside coverage." *Id.* Given *Kepner* and *Teufel*, the Court cannot conclude that the broad language in *Zilisch* requires an insurer to conduct an investigation even when the complaint, on its face, does not plead a covered claim.

Plaintiffs also cite *Lozier v. Auto Owners Ins.*, 951 F.2d 251, 255 (9th Cir. 1991), for the proposition that "an incomplete pre-denial investigation of an insured's claim can expose the insurance company to liability for bad faith." Doc. 102 at 18. But *Lozier* was not a case where the lack of coverage was clear from the face of the complaint. The Ninth Circuit explained that "[a]lthough there was *some* evidence that either Lozier or McDonald (or both) had acted intentionally [triggering the policy's intentional act exclusion], Auto Owners never confirmed this." *Id.* The Ninth Circuit also found that the coverage question

in *Lozier* involved difficult issues of whether the actions of an intoxicated individual can trigger the intentional acts exclusion – issues the insurer did not investigate.

This case is different. In tendering her defense, Ms. Langemeier provided Defendant with a copy of Plaintiffs' complaint in the underlying case, eight pages of deposition from Mr. McDermott, and seven pages of an oral argument transcript where Plaintiffs argued that Ms. Langemeier did not act on behalf of BioNovix. Doc. 95 ¶ 6. The complaint did not plead a covered claim. It was replete with allegations that the wrongful acts of Ms. Langemeier and others occurred as part of the BioNovix business. *See* Doc. 95-3. Although Plaintiff also included a transcript of an oral argument in the underlying lawsuit, the transcript suggests only that Ms. Langemeier's actions were not authorized by the BioNovix board of directors. *See* Doc. 103-1 at 81. It did not suggest that her actions were unrelated to BioNovix. Rather, as the complaint alleged, she was hip-deep in the company's operations, making defamatory statements during conference calls with customers, distributors, shareholders, and vendors; causing BioNovix to issue press releases with similar statements; terminating Plaintiffs' employment with BioNovix and threatening other company employees if they did not comply with her demands; and making statements to a BioNovix Korean distributor that resulted in Plaintiff McDermott's arrest. Doc. 95-3.

Given the documents included in the tender of defense, particularly the complaint in the underlying action, application of the business pursuits exclusion was clear.[6] The Court cannot conclude that Defendant had an obligation to conduct an investigation when the complaint clearly indicated that Defendant's insured committed the allegedly wrongful acts as part of the BioNovix business in which she was a major investor, and other documents in the tender package did not contradict this assertion.

Defendant responded with a letter, based on the complaint, stating that all of the claims in the complaint appeared to arise from Ms. Langemeier's business pursuits or her

---

[6] The excerpts from the McDermott's deposition provided in the tender package simply concerned his unfortunate stroke and other ailments, confirming that he had suffered personal injury. *See* Docs. 95-4 at 22-29;103-2 at 2-3.

actions as a director. Doc. 103-3 at 4-5. *Id*. The letter requested for more information if Ms. Langemeier disagreed with the coverage position. *Id*. at 6. She never responded. Instead, she assigned her claims against Defendant to Plaintiffs. Plaintiffs accepted that assignment in satisfaction of their claims against Ms. Langemeier, taking the assignment subject to whatever infirmities the assigned claims possessed.

The Court concludes that Defendant properly considered the facts alleged in the complaint and determined there was no coverage. *Advance Roofing*, 788 P.2d at 1231 (where complaint did not allege a proper "occurrence" under the policy, insurer had no duty to take further action). Additional investigation was not required to deny coverage, and the Court will grant summary judgment for Defendant on Plaintiffs' bad faith claim.

**IT IS ORDERED**: that Plaintiff's motion for partial summary judgment (Doc. 96) is **denied**. Defendant's motion for summary judgment is (Doc. 94) **granted**. The Clerk is directed to enter judgment accordingly and terminate this matter.

Dated this 20th day of February, 2019.

David G. Campbell
Senior United States District Judge